# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 23, 2010

Lyle W. Cayce
Clerk

No. 09-20651

RICHARD HERSHEY; ROBERTO E. CALLE GRACEY,

Plaintiffs–Appellants

v.

ENERGY TRANSFER PARTNERS, L.P.; ENERGY TRANSFER COMPANY; ETC MARKETING, LTD.; HOUSTON PIPELINE COMPANY,

Defendants–Appellees

*********************************************************************

ROBERTO E. CALLE GRACEY,

Plaintiff–Appellant

v.

ENERGY TRANSFER PARTNERS, L.P.; ENERGY TRANSFER COMPANY, also known as LA Grange Acquisition, L.P.; ETC MARKETING, LTD.; HOUSTON PIPELINE COMPANY,

Defendants–Appellees

Appeal from the United States District Court
for the Southern District of Texas

09-20651

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PRADO, Circuit Judge:

This is a putative class action under the Commodities Exchange Act ("CEA"), alleging manipulation of natural gas futures and options prices. Richard Hershey and Roberto E. Gracey ("Plaintiffs") purchased and sold New York Mercantile Exchange ("NYMEX") natural gas futures contracts. Plaintiffs sued Energy Transfer Partners, L.P. and its affiliates (collectively, "Defendants") for allegedly manipulating the price of natural gas delivered at the Houston Ship Channel ("HSC") and alleged economic harm to their NYMEX natural gas futures contracts caused by that manipulation. Plaintiffs purport to represent a class of natural gas futures and options contracts traders over the period of Defendants' alleged manipulation.

The Commodities Futures Trading Commission ("CFTC") and the Federal Energy Regulatory Commission ("FERC") alleged in previous enforcement actions that Defendants created and then exploited price differences between the HSC and the Henry Hub, a major confluence of natural gas pipelines and the settlement price for all NYMEX natural gas futures contracts. We must now decide whether Plaintiffs may bring a proper claim under the CEA for the alleged manipulation of HSC prices. Because we find that Plaintiffs failed to sufficiently allege that Defendants specifically intended to manipulate NYMEX natural gas futures contracts, we affirm the district court's dismissal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Natural Gas Futures Market

Natural gas is a commodity: a tangible good bought and sold in commerce. BLACK'S LAW DICTIONARY 291 (8th ed. 2004). This tangible good produces a

2

variety of intangible financial derivatives, traded on public markets by investors who have little interest in actually obtaining the natural gas. The market at issue here is NYMEX, although most of Defendants' allegedly manipulative trades occurred on the Intercontinental Exchange ("ICE"), an Internet-only competitor of NYMEX.

If the buyer purchases the commodity for cash and the seller delivers the good "on the spot," it is called a "spot sale." Thus, a spot sale reflects the current price, and therefore the actual present value, of the commodity. Arguably the most important commodities transaction is the futures contract,[1] an agreement "to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price at a future time." BLACK'S LAW DICTIONARY, *supra*, at 699. The asset that is the subject of the future is called the "underlying." The modifier "underlying" has an important effect on "commodity"—the "underlying commodity" of a futures contract is a specific good, governed by the terms of the futures contract. *See Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1043 (S.D.N.Y. 1993) (noting that, in a claim under the CEA provision at issue here, the "'commodity underlying' . . . refers to the commodity specified within the particular futures contract" and finding that particular Treasury notes were not the commodity underlying Treasury bill futures or eurodollar futures); *see also Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980) (noting that "the contract involved in this case, the May 1976 Maine potato futures contract, is for 50,000 pounds of Maine grown potatoes of a specified quality to be delivered at specified points in cars of the Bangor & Aroostook Railroad, between May 7 and May 25, 1976").

---

[1] Or, simply, a "future."

09-20651

A future hedges, or limits, risk and allows for speculation. For example, if Party A thinks that the price for natural gas will increase, it can acquire a future for the later delivery of natural gas at a current set price to avoid paying a possibly higher price at a later date. Party B believes that the price will decrease and agrees to deliver the natural gas to Party A at the later date for the agreed price. Party B may profit from the transaction by waiting to actually acquire the natural gas for delivery until a later date, thereby benefitting from the difference between the amount received for the future and the actual cost to acquire the natural gas.

Most parties who trade in natural gas futures do not want (and simply would be unable to take physical delivery of) the natural gas. Instead, these parties trade in natural gas futures like traditional investors trade in stocks and bonds.[2] The parties financially offset the future by further futures trading as one would sell a stock on the public market. For these parties, the difference between the contract price and the offsetting transaction represents the loss or profit.

The futures contract has two positions, a long and a short. The long party pays for the contract and is obligated to take delivery. The short party receives payment for the future and is obligated to make delivery. If a short party holds the future until it comes due, the "prompt month," then the futures contract becomes a presently enforceable contractual obligation to deliver the natural gas. The parties on opposing sides of the future do not deal with one another; rather,

---

[2] *See In re Amaranth Natural Gas Commodities Litig.* (*Amaranth*), 587 F. Supp. 2d 513, 520–24 (S.D.N.Y. 2008) (providing an overview of the commodities futures market, NYMEX, and natural gas trading and stating that in the spring of 2006, "less than two percent of natural gas futures went to delivery").

they make their trades through a clearinghouse, such as NYMEX. *See In re Natural Gas Commodity Litig.* (*Natural Gas Litig.*), 337 F. Supp. 2d 498, 502 (S.D.N.Y. 2004). The clearinghouse allows futures parties to offset their obligations easily, which introduces fluidity to the market.

The public markets for futures standardize the contracts. Everything, except for price, remains the same from one futures contract to the next.[3] The NYMEX natural gas futures contracts rules "apply to all natural gas bought and sold for future delivery on [NYMEX] with delivery at the Henry Hub." *Id.* § 220.01. Each NYMEX futures contract represents ten billion British thermal units of natural gas. *Id.* § 220.05. The price for the natural gas that is delivered at the Henry Hub is the "settlement price" of the NYMEX natural gas futures contract.[4]

---

[3] *See* N.Y. Merchantile Exch., Inc., *NYMEX Rulebook*, § 220.01 (2009), *available at* http://www.cmegroup.com/rulebook/NYMEX/2/220.pdf (last visited June 22, 2010) (hereinafter *NYMEX Rulebook*).

[4] The actual calculation of the settlement price is based on a series of inputs. As detailed in Plaintiffs' Amended Complaint:

> The settlement price of a NYMEX natural gas futures contract is the volume-weighted average price of trades made during the 30-minute settlement period, which is the last 30 minutes of trading on the termination day for the "prompt-month" contract. The "prompt-month" is the next calendar month. The "termination day" for NYMEX natural gas futures contracts is the third-to-last business day of the month preceding the prompt month, and the settlement period occurs from 2:00 p.m. to 2:30 p.m. EST on the termination day (except for when the NYMEX is operating on a holiday schedule). So, for example, for August 2007, the prompt-month contract was the September 2007 NYMEX natural gas futures contract. The last business day in August 2007 was Friday, August 31, so the settlement period for the September 2007 NYMEX natural gas futures contract took place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.

09-20651

The Henry Hub is a physical delivery point near Erath, Louisiana, and the confluence of many interstate and intrastate natural gas pipelines. *Amaranth*, 587 F. Supp. 2d at 523. The spot price of physical delivery at the Henry Hub underpins every natural gas future on NYMEX, regardless of whether that future goes to physical delivery. *See NYMEX Rulebook*, § 220.01.[5]

The Henry Hub is not the exclusive delivery point for all natural gas in the United States. Defendants' purchases and sales represent the bulk of the trades involving natural gas delivered through the HSC, a major conduit of natural gas to the Texas market. Because the price of delivery can vary among hubs, many large traders in natural gas commodities arbitrage—a practice of taking advantage of the price differential among markets. BLACK'S LAW DICTIONARY, *supra*, at 112. Defendants here used natural gas futures "basis swaps" to accomplish this arbitrage. A swap is a pure financial instrument,[6] based on the difference between two fluctuating values. In the natural gas basis swaps here, the value of the swap is the difference between the settlement price of the NYMEX natural gas futures contract for a given contract month and that of the monthly index at the HSC for that same month. Put simply, the wider the gap between prices at the Henry Hub and the HSC, the more money Defendants stood to make from their basis swaps.

Although prices differ between delivery hubs, those differences quickly converge because of the nature of the public market. This convergence is due,

---

[5] The Henry Hub has corollaries in other commodities. For example, all NYMEX futures concerning light, sweet crude oil are tied to a hub in Cushing, Oklahoma. *See In re Crude Oil Commodity Litig.* (*Crude Oil Litig.*), No. 06 Civ. 6677, 2007 WL 1946553, at *1–*2 (S.D.N.Y. June 28, 2007).

[6] There is no obligation of delivery or performance based on the swap.

in large part, to a system of price reporting.  Through Internet terminals connected to ICE or NYMEX, traders can see the flow of trades.  Additionally, Platts, a reporting agency, collects certain price and volume information from trading participants, and publishes the monthly *Inside FERC's Gas Market Report* ("*IFERC*").  The public pricing information influences traders' forecasts and impacts decisions to acquire natural gas.  The public pricing information will reflect any dips or spikes in prices, which in turn impacts the priace at other hubs, demonstrating a high correlation between prices of natural gas at hubs nationwide.

## B.    CFTC and FERC Enforcement Actions against Defendants

Plaintiffs' allegations substantially mirror the allegations in regulatory actions against Defendants by the CFTC and FERC.  In July 2007, the FERC issued an Order to Show Cause and Notice of Proposed Penalties ("FERC Order to Show Cause") alleging that Defendants engaged in manipulative trading.[7] On the same day, the CFTC filed a complaint in the Northern District of Texas against Defendants, alleging market manipulation and seeking injunctive and equitable relief, along with civil penalties under the CEA.[8]

The FERC Order to Show Cause alleges, with great specificity, Defendants' use of financial constructs and coordinated trades to manipulate HSC prices:

---

[7] *See* FERC, 120 F.E.R.C. ¶ 61,086, Docket No. IN06-3-002, *available at* http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf (last visited June 22, 2010).

[8] *See* Complaint at 1–2, *CFTC v. Energy Transfer Partners, L.P.*, No. 3:07-cv-01301 (N.D. Tex. July 26, 2007), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfetpcomplaint072607.pdf.

09-20651

[Energy Transfer Partners ("ETP")] dominated sales of fixed-price gas at HSC, often comprising 80 percent or more of total sales. ETP reported its fixed price sales at HSC to [IFERC] and thus was able to use its domination of the market to virtually set the IFERC HSC index. In spite of ETP's sales activity at HSC, it was consistently a net buyer of monthly gas priced at the IFERC HSC index, and thus was positioned to benefit from the lower prices it caused in the months it manipulated fixed-price sales at HSC. . . .

At the same time, ETP had entered into . . . basis swaps to leverage its benefit from suppressing monthly physical prices at HSC. . . . [Thus,] ETP profited if the difference between prices at HSC and the NYMEX Contract widened, i.e., the price at HSC became lower relative to the higher priced NYMEX Contract. . . . Because ETP had the power to suppress price at HSC, this was not really a bet at all, but a manipulation that was spectacularly successful in October 2005—ETP realized more than $40,000,000 in unjust profits—and highly profitable in eight other months from January 2004 through December 2005.

FERC Order to Show Cause, at 3.

The CFTC settled with Defendants for $10 million.[9] The consent letter permanently enjoined Defendants from any further manipulation of any commodity.[10] Defendants also settled with the FERC, for $30 million, and agreed to periodic independent audits.[11]

---

[9] *See* Press Release, CFTC, Energy Transfer Partners, L.P. and Three of Its Subsidiaries to Pay a $10 Million Penalty to Settle CFTC Action Alleging Attempted Manipulation of Natural Gas Prices (Mar. 17, 2008), *available at* http://www.cftc.gov/pressroom/pressreleases/pr5471-08.html (last visited June 22, 2010).

[10] *See* Consent Order of Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendants Energy Transfer Partners, L.P., Energy Transfer Co., ERC marketing, Ltd., and Houston Pipeline Co. at 3, *CFTC v. Energy Transfer Partners, L.P.*, No. 3:07-cv-01301 (N.D. Tex. Mar. 17, 2008), *available at* http://www.cftc.gov/ucm/ groups/public/@lrenforcementactions/documents/legalpleading/enfetporder031708.pdf.

[11] *See* Press Release, FERC, FERC Approves Record $30 Million Settlement in ETP Market Manipulation Case, 128 F.E.R.C. ¶ 61,269, Docket No. IN06-3-003,

## C.    Plaintiffs' Action

Plaintiffs purchased long positions in NYMEX natural gas futures, and sold those position at a loss the same day.  After the CFTC and FERC actions, Plaintiffs filed a Consolidated Class Action Complaint, alleging commodity futures market manipulation and aiding and abetting under 7 U.S.C. §§ 6(c), 13(a), and 25(a).  These two traders purport to represent a class of others similarly situated, defined in their complaint as: "[a]ll persons . . . (a) who sold NYMEX natural gas futures contracts, or (b) purchased or sold NYMEX natural gas options contracts between December 29, 2003 and December 31, 2006 . . . ."  Plaintiffs' allegations are based on the CFTC and FERC actions.  The crux of this case, however, is whether Plaintiffs can wrestle the CFTC and FERC allegations into a private cause of action.

Plaintiffs' theory of liability is as follows: Defendants had the power to suppress prices at HSC because of their dominant market position at that hub.  Defendants manipulated NYMEX futures and options contracts by selling, during the bidweek, large quantities of natural gas for delivery at HSC to depress the price of the natural gas at that hub to an artificial level. Defendants provided the artificially low price information to Platts, knowing that those prices would be reflected in HSC's monthly price index.  Those reported figures resulted in a published index that contained manipulated and artificial figures.  Defendants engaged in this manipulation intending to drive the HSC price down against the Henry Hub price so they could profit from the difference between the two delivery hubs.  The low HSC monthly index caused the NYMEX price to fluctuate artificially, resulting in a lower price.  Plaintiffs suffered damages by

http://www.ferc.gov/news/news-releases/2009/2009-3/09-21-09.pdf (last visited June 22, 2010).

trading NYMEX natural gas futures and options contracts at artificial prices during the enumerated class period.

## D.    The District Court's Dismissal

Defendants moved to dismiss Plaintiffs' Amended Complaint, arguing that Plaintiffs failed to allege that Defendants specifically intended to manipulate the price of natural gas at the Henry Hub, and thus Plaintiffs failed to allege the CEA's requirement that the manipulation be specifically directed toward the underlying commodity of the contract. It would be illogical, Defendants argued, for Defendants to intend to depress Henry Hub prices if they allegedly benefitted from the *difference* between Henry Hub and HSC prices. Plaintiffs responded that the underlying of a NYMEX futures contract is natural gas generally, rather than gas delivered at the Henry Hub, because the Henry Hub spot price merely sets national benchmark. Because the HSC and Henry Hub prices were correlated, Plaintiffs argued that Defendants' manipulation of the HSC price would necessarily drive down the cost of gas at the Henry Hub.

The district court agreed with Defendant and dismissed the case with prejudice. The district court reasoned that the private right of action under the CEA applies only to alleged manipulation of the price of the commodity underlying the contract, 7 U.S.C. § 25(a), and found that the commodity underlying Plaintiffs' NYMEX natural gas futures is the natural gas bought and sold for delivery at the Henry Hub.

The district court held that Plaintiffs failed to state a claim because they did not allege facts tending to show that Defendants had specifically intended to manipulate the cost of natural gas delivered at the Henry Hub. Plaintiffs filed a motion to reconsider, which the district court denied. Plaintiffs timely

09-20651

appealed.

## II. ANALYSIS

### A.    Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291 over the final order of the district court dismissing Plaintiffs' Amended Complaint. We review *de novo* the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 469 (5th Cir. 2006) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs' Amended Complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "'[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).[12]

However, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556). A court should not accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," which "do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 1949–50.

### B.    The Private Right of Action under the CEA

The CEA provides a private right of action against individuals "who

---

[12] The parties dispute whether the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to this case. Because we hold that Plaintiffs failed to state a claim under the liberal pleading standards of Rule 8, we do not reach this issue.

purchased or sold a [futures] contract" if those individuals "manipulat[ed] the price of any such contract or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(D). The parties do not dispute that Plaintiffs acquired and sold NYMEX natural gas futures contracts during the period of Defendants' alleged manipulation. However, we have yet to define "manipulation" under the CEA, nor have we defined "commodity underlying."

### 1.    Specific Intent for Manipulation Claims under the CEA

To be liable for commodities fraud, a defendant must possess "the intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 (1976) (discussing scienter requirement for securities fraud). The obligation to plead *specific* intent may be traced back to decisions establishing an agency's burden of proof. *See Grossman v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 706 F. Supp. 221, 231 (S.D.N.Y. 1989) (citing *In the Matter of Cox*, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,786 at 34,060–61 (CFTC July 15, 1987)); *see also In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1058–59 (N.D. Ill. 1995) ("The court recognizes that a manipulation claim requires a showing of specific intent, that is, a showing that 'the accused acted (or failed to act) with the purpose or conscious object' of influencing prices.") (quoting *In re Ind. Farm Bureau Coop. Assoc., Inc.*, [1982–1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,283 (CFTC Dec. 17, 1982)).

Although we have not had an opportunity to specifically adopt a pleading standard for commodities manipulation claims, the specific intent standard appears to have substantial support. *See Amaranth*, 587 F. Supp. 2d at 530 (applying specific intent standard against private cause of action); *CFTC v. Enron Corp.*, No. H-03-909, 2004 WL 594752, at *4 (S.D. Tex. Mar. 10, 2004)

(applying specific intent to claim by CFTC against firm for market manipulation); *Natural Gas Litig.*, 337 F. Supp. 2d at 507 (discussing different manipulation standards, each of which includes the specific intent requirement); *Grossman*, 706 F. Supp. at 231 n.12 (collecting cases). In *Volkart Bros., Inc. v. Freeman*, we established that manipulation is "any and every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets." 311 F.2d 52, 58 (5th Cir. 1962) (citation omitted). Despite this broad standard, we noted the importance of specific intent, stating that "there must be a purpose to create prices not responsive to the forces of supply and demand." *Id.* Because the specific intent standard is grounded in sound reasoning and precedent, we adopt it for private causes of action under the CEA, 7 U.S.C. §§ 13(a) and 25(a).

2. **The Underlying Commodity of a NYMEX Natural Gas Futures Contract**

As previously discussed, all natural gas futures traded through NYMEX are governed by the *NYMEX Rulebook*. *See NYMEX Rulebook*, § 220.01. Only the price varies from one futures contract to the next. Each future obligates the long party to accept delivery, and the short party to make delivery over the physical pipelines at Henry Hub over the course of the delivery month. *Id.* § 220.10. The NYMEX standard contract provides details of the delivery, including its timing and flow rate. *See, e.g.*, *id.* §§ 220.12 & 220.13. It is exceedingly unlikely that Plaintiffs ever expected to accept delivery of natural gas through an interconnection point at Henry Hub as each named Plaintiff held his respective futures contract for a single trading day before selling it for a loss. However, this fact does not obviate the futures holder's obligation to accept delivery at the Henry Hub.

Plaintiffs argue that, contrary to the district court's finding, the underlying of a NYMEX natural gas future is natural gas generally, rather than the gas delivered at the Henry Hub. Plaintiffs contend that prices of physical natural gas, wherever bought or sold, directly affect NYMEX natural gas futures contract prices. Plaintiffs further argue that the interconnected nature of the industry necessitates a finding that natural gas generally is the underlying commodity because the fungible commodity at any hub is "inextricably linked" with the NYMEX natural gas futures price. Plaintiffs also point out that the private cause of action provision of the CEA does not reference NYMEX prices nor any specific delivery location, but allows a claim for manipulation of the "underlying commodity" of a futures contract. 7 U.S.C. §§ 13(a), 25(a).

Although no circuit has squarely addressed what constitutes the underlying commodity of a NYMEX natural gas futures, *cf. Leist*, 638 F.2d at 286 (concerning a case involving May 1976 Maine potato futures and noting that those futures involve "Maine grown potatoes of a *specified* quality to be delivered at *specified points* in cars of the Bangor & Aroostook Railroad, between May 7 and May 25, 1976") (emphasis added), we cannot agree with Plaintiffs' position. Plaintiffs concede that the settlement price of a NYMEX natural gas futures contract is the price of natural gas delivered at the Henry Hub. Under the CEA, actionable manipulation must be directed at "the price of the commodity underlying *such* contract." 7 U.S.C. § 25(a)(1)(D) (emphasis added). By definition, the underlying of a futures contract depends on the *contract* itself. It is undisputed that the contract in question here is the NYMEX natural gas futures contract. Therefore, Plaintiffs must allege that Defendants specifically intended to manipulate the underlying of *that* contract, not some hypothetical

14

natural gas futures contract.

The NYMEX natural gas futures contract is specifically tied to, and standardized against, the spot price at the Henry Hub. Although a party to a NYMEX natural gas futures contract, at an abstract level, deals generally with natural gas, that party may only accept or make delivery at the Henry Hub. This delivery restriction, standard to all NYMEX natural gas futures contracts, leads us to reason that the underlying commodity of a NYMEX natural gas futures contract is not natural gas wherever bought and sold, but the specific natural gas delivered at the Henry Hub.

## C.    Plaintiffs' Amended Complaint

The district court found that a private cause of action under the CEA requires Plaintiffs to plead that (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price. *See In re Energy Transfer Partners Natural Gas Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *3 (S.D. Tex. Aug. 26, 2009) (citing 7 U.S.C. § 13(a); *Amaranth*, 587 F. Supp. 2d at 530; *Natural Gas Litig.*, 337 F. Supp. 2d at 507; *Crude Oil Litig.*, 2007 WL 19465553, at *3; *Enron Corp.*, 2007 WL 594752, at *4). We agree with the district court's finding and adopt this standard for pleading under the CEA's private cause of action, 7 U.S.C. §§ 13(a), 25(a).

Plaintiffs' allege that Defendants intentionally manipulated the price of natural gas at the HSC. When Defendants reported these artificial prices to Platts, the artificial prices impacted the published index and likely influenced the price of gas at the Henry Hub, thus impacting the price of NYMEX natural gas futures contracts. The parties dispute the plausibility of Plaintiffs'

allegation that Defendants specifically intended to influence either the price at the Henry Hub or the price of NYMEX natural gas, assuming the truth of Plaintiffs' other factual allegations.

Plaintiffs attempt to tie Defendants' manipulation of the HSC prices to the price of Henry Hub natural gas and NYMEX futures contracts by arguing that Defendants knew or should have know that their manipulation of natural gas prices at HSC would result in the artificial suppression of the prices of NYMEX natural gas futures contracts. In other words, Plaintiffs argue that Defendants were aware that the correlation between the natural gas hubs would cause the Henry Hub price to sink if they flooded the HSC. Directing a similar argument to the underlying commodity, Plaintiffs contend that because Defendants submitted artificially low HSC price information for publication, the depression of Henry Hub spot prices was "intentional and inevitable." Plaintiffs' argument is without merit: intentionality and inevitability are not legally equivalent.

In *Amaranth*, a class of futures traders alleged that a slew of corporate entities, collectively "Amaranth," conspired to drive up the price of NYMEX futures and benefit from advantageous swaps. 587 F. Supp. 2d at 524. Amaranth allegedly accomplished its manipulation by acquiring massive long positions of NYMEX natural gas futures, thereby "signal[ing] significant demand, causing market prices to rise." *Id.* As those futures contracts went to settlement, "Amaranth would sell a significant number of futures . . . artificially depress[ing] the settlement price of those futures." *Id.* Amaranth would "lose money on the futures but would profit on the swaps." *Id.* All of Amaranth's alleged manipulations were directed toward and directly impacted the NYMEX natural gas futures market and the *Amaranth* plaintiffs alleged that Amaranth

09-20651

specifically intended to manipulate the market of the futures that they had purchased.

The *Amaranth* plaintiffs' allegations are different than those made by Plaintiffs here. Defendants directed every alleged manipulation toward the HSC. Indeed, Defendants benefitted from a scheme that depended on the spread between the Henry Hub and HSC. The wider the spread, the greater the return on the financial basis swaps and thus it would be counterproductive for Defendants to drive down the Henry Hub spot price.

In *Natural Gas Litigation*, a group of traders brought similar claims to those presented here, following enforcement actions after CFTC and FERC investigations. 337 F. Supp. 2d at 502. The *Natural Gas Litigation* plaintiffs alleged that "a group of companies that market and trade natural gas in the physical and futures markets, acted together to unlawfully manipulate the prices of natural gas futures and option contracts *traded on the NYMEX*." *Id.* at 502 (footnote omitted) (emphasis added). Although the alleged scheme in *Natural Gas Litigation* involved the defendants' submission of false pricing information on spot trades at various delivery hubs, it is clear that the complaint alleged an overarching scheme to influence NYMEX natural gas futures prices. *Id.* at 502–03.

The scheme in *Natural Gas Litigation* is decidedly different from Plaintiffs' allegations here. Although the *Natural Gas Litigation* defendants reported artificial prices at hubs other than the Henry Hub in order to influence published price indices, the plaintiffs alleged that the intent behind these false reports was to drive down NYMEX natural gas futures prices. *Id.* Here, the intent of Defendants' alleged false reporting was to drive down the price of

17

natural gas at the HSC hub.  The effect on the Henry Hub, and NYMEX futures contracts, was merely an unintended consequence of the Defendants' manipulative trading.

In *Soybean Futures*, the district court granted that "[a]s a general matter . . . questions of intent are inappropriate for resolution on summary judgment" but recognized that in some instances dismissal is appropriate because "'the plaintiff presents no indication of motive and intent supportive of his position.'"  892 F. Supp. at 1058 (quoting *Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986)).  Plaintiffs here cannot tie Defendants' manipulation of the HSC price index to an intent or motive to manipulate the Henry Hub price and thus summary judgment was not premature.  Under a specific intent standard, mere knowledge is not enough; Defendants must have specifically intended to impact the NYMEX natural gas futures market.  Plaintiffs here allege only that Defendants knew or should have known that their manipulative actions would depress the NYMEX natural gas futures prices.  Therefore, Plaintiffs have not stated a claim under the CEA.

## III.  CONCLUSION

The CFTF and FERC enforcement actions against Defendants raise the specter of manipulation; accepting Plaintiffs' allegations as true leads to the same conclusion.  The alleged manipulation had only a tangential, although perhaps foreseeable, effect on the price of natural gas delivered at the Henry Hub and the price of NYMEX natural gas futures contracts.  To state a claim under the CEA, however, Plaintiffs must plead facts establishing that Defendants specifically intended to influence the natural gas delivered at the Henry Hub or the price of NYMEX natural gas futures contracts.  They failed to

09-20651

do so.  We therefore AFFIRM the district court's order dismissing this case.

AFFIRMED.