In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3239

IN RE:

DAIRY FARMERS OF AMERICA, INC.
CHEESE ANTITRUST LITIGATION,

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 3690 — **Robert M. Dow, Jr.**, *Judge.*

---

ARGUED APRIL 23, 2015 — DECIDED SEPTEMBER 1, 2015

---

Before BAUER and SYKES, *Circuit Judges,* and REAGAN, *Chief District Judge.*[*]

BAUER, *Circuit Judge.* Plaintiff-appellants, Indriolo Distributors, Inc., Knutson's, Inc., and Valley Gold, LLC ("Appellants"), filed a class action against Dairy Farmers of America ("DFA"), a dairy marketing cooperative, Keller's Creamery,

---

[*] The Honorable Michael J. Reagan, Chief Judge of the United States District Court for the Southern District of Illinois, sitting by designation.

L.P. ("Keller's"), a butter manufacturer, two DFA officers, and two Keller's officers. The case has been ongoing since its consolidation in the Northern District of Illinois in 2009. Since then, all parties named in the initial complaint have reached a settlement ("DFA Settlement") with Appellants, which the district court approved on September 12, 2014.

On March 22, 2012, Appellants filed an amended class action complaint, adding Schreiber Foods, Inc. ("Schreiber") as a defendant and alleging violations of §§ 1 and 2 of the Sherman Act, the California Cartwright Act, the Commodity Exchange Act, and RICO. On Schreiber's motion, the district court dismissed the § 2 Sherman Act claims, but allowed Appellants to go forward on their claims arising under § 1 of the Sherman Act, the Commodity Exchange Act, and the Cartwright Act, as well as their claims for unjust enrichment and restitution. On December 13, 2013, Schreiber moved for summary judgment on these remaining claims, which the district court granted. For the following reasons, we affirm.

## I. BACKGROUND

Appellants contend that between May 24, 2004, and June 23, 2004, Schreiber conspired with DFA to purchase cheese traded on the Chicago Mercantile Exchange ("CME") in order to help DFA and Keller's manipulate the price of Class III milk futures. They allege that Schreiber and DFA purchased cheese to stabilize prices while DFA and Keller's unwound their milk futures positions at a profit, then Schreiber and DFA stopped buying cheese, causing the cheese price to crash at the end of June. Schreiber argues that its purchasing activity during the relevant time period was neither unusual

nor parallel to DFA's activity and can be explained by Schreiber's independent business interest in preventing a large spread between the prices of block cheese and barrel cheese.

Schreiber manufactures and distributes various cheese products, including natural cheese and process cheese. Its products are purchased for use by restaurants and other food service distributors, or produced as store brand products for grocery stores. Schreiber purchases most of its cheese directly from suppliers, but it also purchases a small fraction of its cheese on the CME. The CME hosts the trading of spot commodities, including spot barrel and block cheese, as well as commodity futures such as Class III milk futures. The CME cheese markets serve an informal "price discovery" function and many cheese transactions in the wider market are based on CME cheese prices. The differential between the CME block and barrel closing prices is known as the "spread." The block and barrel cheese spread is typically three cents, but can fluctuate higher or lower depending on several factors, such as supply and demand.

According to Schreiber, because it purchases upwards of one billion pounds of milk to turn into process cheese every year, a larger spread between block and barrel cheese can be damaging to it as a producer of barrel and process cheese. For example, a large spread in cheese pricing decreases Schreiber's profits on milk turned into and sold as process cheese. Therefore, Schreiber would regularly purchase barrel cheese on the CME in an effort to correct or maintain the three cent spread.

In 2004, Schreiber purchased approximately 350 million pounds of bulk cheese at a cost of approximately $1.2 billion.

Schreiber purchased 93 million pounds of that cheese from DFA, a dairy marketing cooperative consisting of more than 18,000 dairy farmers in 48 states, at a cost of about $180 million. The deal is representative of the significance of the relationship between DFA and Schreiber in 2004; although the two were horizontal competitors, Schreiber was also one of DFA's largest customers and DFA was Schreiber's second largest supplier. By comparison, in 2003, Schreiber purchased approximately 602 million pounds of bulk cheese for $841.5 million, with 116 million pounds of that cheese coming from DFA, at a cost of approximately $159 million.

Of the 120 barrels Schreiber purchased in fiscal year 2004 (October 2003 to September 2004), 107 were purchased between April 20, 2004, and June 22, 2004. According to Schreiber, a significant amount of the 2004 activity was directed toward correcting a large spread. In January 2004, the spread was seven cents, rather than Schreiber's preferred three cents. By February, the spread dropped to five cents and held steady around four or five cents through April. But by May 5, the spread grew to 11.5 cents, and by May 20, it had grown to 17 cents. On May 24, the CME barrel cheese price increased 16 cents, closing the spread to three cents. The record shows that at each of these price intervals, Schreiber had acted to close the spread by purchasing cheese on the CME.

DFA was also active on the CME cheese market in 2004. DFA purchased at least 50 loads of CME block cheese in May 2004. DFA testified that it sought to defend the CME block market because of the impact that it had on the prices that its dairy farmers received for milk; if CME cheese prices were higher, DFA achieved higher pricing for its members' milk.

From May 24 to June 22, 2004, Schreiber and DFA purchased all of the block and barrel cheese traded on the CME.

Throughout this time, Schreiber and DFA employees engaged in regular communications. The communications included meetings between DFA and Schreiber's top executives; between April and June 2004, executives met five times. In April 2004, Gary Hanman (DFA's President and CEO during the relevant time period) and Larry Ferguson (Schreiber's CEO) met, but the substance of the meeting is unclear. Hanman stated he does not recall what was discussed, while Ferguson stated that they met to discuss a patent infringement lawsuit. The CEOs met again on April 30 and May 1, this time with other executives. Neither recall what was discussed at those meetings. On May 11, Hanman, David Pozniak (the head of Schreiber's CME cheese purchasing), and other dairy executives met at Schreiber's offices in Green Bay, Wisconsin. The agenda for the May 11 meeting included "market conditions & forecasts," which Hanman testified was typical and involved discussions about production and how to read markets, although "generally [they] would not talk about activities on the CME." And on May 26, Mark Korsmeyer (President of DFA's American Dairy Brands), Pozniak, and Sam McCroskey (then President of DFA's Dairy Food Products) met; Schreiber contends that the meeting was about a potential joint venture. No additional evidence has been presented about the substance of the meeting.

Based on the discovery of these activities and interactions, Appellants added Schreiber as a defendant on March 22, 2012,

alleging antitrust violations.[1] Schreiber moved for summary judgment on December 13, 2013, which the district court granted on August 18, 2014.

## II. DISCUSSION

Appellants raise five arguments on appeal. The first three relate to the district court's summary judgment order—Appellants argue that summary judgment on their antitrust conspiracy claims under § 1 of the Sherman Act and California's Cartwright Act, their claim under the CEA, and on their unjust enrichment claim was inappropriate. Appellants' fourth argument alleges that the district court abused its discretion by limiting discovery to only "high-level" employees and prohibiting the depositions of several employees. And fifth, Appellants contend that the district court erred in including Schreiber in the DFA Settlement.

---

[1] Appellants originally brought this consolidated putative class action against DFA, Keller's, and four individual officers of those companies, alleging conspiracies to inflate milk futures and spot cheese prices from April to June 2004. During discovery, DFA and Keller's produced copies of documents subpoenaed by the Commodity Futures Trading Commission ("CFTC") as a part of an earlier investigation into DFA and Keller's activities on the CME in 2004. The documents included documents from Schreiber regarding its communication and relationship with DFA, as well as its cheese trading on the CME. The CFTC did not bring charges against Schreiber or otherwise suggest involvement in DFA and Keller's conspiracy.

### A. Antitrust Conspiracy Claims

The thrust of Appellants' remaining antitrust claim[2] is that from May 24, 2004 to June 23, 2004, Schreiber conspired with DFA to manipulate the price of Class III milk futures on the CME in violation of § 1 of the Sherman Act and California's Cartwright Act. The district court held that Appellants' evidence did not present a question for a jury on whether Schreiber conspired to manipulate the price of milk futures by purchasing spot cheese. Appellants argue that they have provided sufficient evidence to survive Schreiber's summary judgment motion. We review a grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party. *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 397 (7th Cir. 2012). "'[B]ecause the Cartwright Act is patterned after the federal Sherman Act and both have their roots in the common law, federal cases interpreting the Sherman Act are applicable in construing the Cartwright Act.'" *In re Copper Antitrust Litigation*, 436 F.3d 782, 802 (7th Cir. 2006) (quoting *Oakland-Alameda Cnty Builders' Exch. v. F.P. Lathrop Constr. Co.*, 482 P.2d 226, 231 n.3 (Cal. 1971)). Therefore, we will conduct a single analysis for both claims using federal cases interpreting the Sherman Act.

Section 1 of the Sherman Act prohibits "[e]very contract, combination … or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, "though courts have long restricted its

---

[2]  The district court dismissed Appellants other conspiracy claims against Schreiber—monopolization and attempted monopolization in violation of § 2 of the Sherman Act—earlier in this litigation.

reach to agreements that unreasonably restrain trade," *Omni-
icare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir.
2011). Agreements to fix prices unambiguously fall within the
ambit of § 1. *Id*. To prove a § 1 claim, plaintiffs must prove
three things: (1) defendants had a contract, combination, or
conspiracy ("an agreement"); (2) as a result, trade in the
relevant market was unreasonably restrained; and (3) they
were injured. *Id*.

"To show concerted action, antitrust plaintiffs must
produce evidence that would allow a jury to infer that the
alleged conspirators 'had a conscious commitment to a
common scheme designed to achieve an unlawful objective.'"
*Id*. at 706 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465
U.S. 752, 764 (1984)). The evidence must "reveal 'a unity of
purpose or a common design and understanding, or a meeting
of minds in an unlawful arrangement.'" *Id*. (quoting *Am.
Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). In sum,
Appellants must produce evidence showing there is a genuine
issue of material fact as to whether Schreiber's decision to
purchase spot cheese on the CME was made by Schreiber
alone, or while acting in concert with DFA.

To determine whether summary judgment is appropriate
in light of the produced evidence, we use a two-part inquiry.
First, we "assess whether [Appellants'] evidence of agreement
is ambiguous—that is, whether it is equally consistent with
[Schreiber's] permissible independent interests as it is with
improper activity." *Id.* at 707. Appellants argue that communi-
cations between DFA and Schreiber employees support an
inference of conspiracy and tend to rule out an inference of

independent activity. Considering the evidence as a whole, we disagree. Appellants' evidence highlights "conduct as consistent with permissible competition as with illegal conspiracy," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), which "does not, standing alone, support an inference of antitrust conspiracy." *Id*.

Appellants' core evidence, communications between employees at Schreiber and DFA, could be understood as a part of a legitimate business relationship as readily as they could be understood as a part of a conspiracy. Although the two companies were competitors, DFA was also one of Schreiber's main suppliers, and Schreiber was one of DFA's largest customers, giving them a number of legitimate reasons to communicate with each other. Additionally, Appellants have not pointed to a single communication that suggests a meeting of the minds to fix prices.

Because we find the evidence of agreement is ambiguous, we now "look for any evidence that tends to exclude the possibility that [Schreiber was] pursuing independent interests." *Omnicare*, 629 F.3d at 707; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) ("[P]roof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action … and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently …" (citations omitted)).

Appellants argue that parallel inflation of public market prices and "unusual" parallel conduct are more consistent with agreement than individual action. But this position merely

reiterates the ambiguity of Appellants' evidence of agreement and does nothing to diminish the inference of independent action, particularly in light of Schreiber's evidence; Schreiber has provided voluminous evidence showing that Schreiber's CME purchasing activity was the result of its own interest in restoring a certain spread between the prices of block and barrel cheese. Without evidence tending to exclude the possibility that Schreiber was pursuing independent interests when it purchased cheese on the CME, Appellants have not raised a genuine issue of material fact as to whether Schreiber conspired with DFA. Therefore, we affirm the district court's grant of summary judgment in favor of Schreiber on the § 1 Sherman Act and Cartwright Act claims.

### B.  Commodity Exchange Act

Appellants also contend that Schreiber conspired with the co-defendants to manipulate CME cheese prices, which necessarily resulted in higher CME Class III milk future prices, in violation of the CEA. The district court granted summary judgment in favor of Schreiber on this count holding that the CEA does not provide a private right of action for manipulation of CME cheese prices because the commodity underlying the CME Class III milk futures contract at issue is Class III milk, not spot cheese. On appeal, Appellants argue this was error. Specifically, Appellants argue that they can proceed on a CEA claim because spot cheese is the commodity underlying the Class III milk futures contracts and that they have raised a genuine issue of fact as to Schreiber's involvement in price manipulation.

Our analysis begins, then, with a determination of the commodity underlying the futures contract at issue. Under the CEA, actionable manipulation must be directed at "the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(D)(iii). Appellants essentially argue that because cheese affects the Class III milk futures contract, it is the commodity underlying the contract.

Having no case law on this issue in our own circuit, we turn to our sister circuits for guidance. The Fifth Circuit considered and rejected an argument very similar to Appellants' in *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th Cir. 2010). In *Hershey*, the plaintiffs argued that natural gas generally was the underlying commodity of a natural gas futures contract. The Fifth Circuit concluded, however, that even though natural gas prices everywhere affected the price of natural gas delivered under the contract, the CEA only permitted claims directed at the price of a commodity underlying such contract. *Id*. at 247. Looking to the applicable exchange rules, the court determined (and the plaintiffs conceded) that the settlement price of a natural gas futures contract is "the price of natural gas delivered at the Henry Hub," not natural gas generally. *Id*. Therefore, the court held that the plaintiffs were required to "allege that Defendants specifically intended to manipulate the underlying [commodity] of *that* contract, not some hypothetical natural gas futures contract." *Id*. (emphasis in original).

Borrowing this reasoning, we must look to the futures contract at issue to determine its underlying commodity. It is undisputed that the contract in question in this case is a

Class III milk futures contract. According to the CME Rulebook, which governs the contract, "[e]ach [Class III milk] futures contract shall be valued at 2,000 times the USDA Class III Price for milk." *CME Rulebook*, § 5201. The CME Rulebook further specifies that "the USDA Class III price for milk for the month" determines the settlement price of Class III milk futures traded on the CME. *Id.* at § 5203.A. Therefore, the commodity specified in the Class III milk futures contract is milk, not cheese, as milk prices determine the settlement of the contract. Because milk is the underlying commodity, Appellants must raise a genuine issue of fact as to whether Schreiber specifically intended to manipulate the price of *milk* in order to survive Schreiber's motion for summary judgment on Appellants' CEA claim.

We agree with the district court that Appellants have failed to raise a genuine issue of material fact precluding summary judgment on their manipulation claim. To prevail on a claim of manipulation, Appellants must prove four elements: (1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price. *See Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1177–78 (7th Cir. 1991); *see also In re Soybean Futures Litig.*, 892 F. Supp. 1025, 2045 (N.D. Ill. 1995). The wrinkle in Appellants' case is with the fourth element. As stated above, the underlying commodity relevant to this CEA claim is Class III milk, but there is no evidence in the record that Schreiber was interested in milk futures, let alone any evidence showing specific intent to cause an artificial price. Appellants point to internal documents that they contend

reflect Schreiber held and traded Class III milk futures positions in May and June 2004. But the evidence in the record does not support an inference of intent to inflate milk prices. The evidence merely reveals that Schreiber had a continual interest in the CME cheese spread. In fact, the evidence would more easily support an inference that Schreiber was interested in keeping milk prices down, as higher milk prices would only serve to increase Schreiber's costs.

A plaintiff may alternatively recover from one who aids or abets another's price manipulation violation. *See* 7 U.S.C. § 25(a)(1). To demonstrate an aiding and abetting claim, Appellants must first demonstrate the components of a manipulation claim against a principal. *See Damato v. Hermanson*, 153 F.3d 464, 470–71 (7th Cir. 1998). Second, they must prove that Schreiber (1) had knowledge of the principal's intent to commit a violation of the CEA by manipulating the price of milk; (2) had the intent to further that violation; and (3) committed some act in furtherance of the scheme. *Id*. at 473. But Appellants' claim again falters on intent. Appellants' evidence simply does not support an inference that anyone at Schreiber was aware of the alleged plan to affect the Class III milk futures market. Schreiber employees, including Ferguson and Chris Herlache (a Risk Analyst and Schreiber employee in charge of CME cheese trading during the relevant period), testified that they were unaware of any plan to inflate prices. Additionally, as with the manipulation claim against Schreiber as a principal, there is no evidence in the record supporting an inference that Schreiber intended to further price manipulation of milk futures. For these reasons, we affirm the district court's grant of summary judgment on Appellants' CEA claim.

## C. Unjust Enrichment

The district court granted summary judgment against Appellants' on their unjust enrichment claim because Appellants failed to establish any statutory violation underlying the claim. On appeal, Appellants argue that they have provided evidence sufficient to show Schreiber conspired with DFA in violation of the Sherman Act and that Schreiber manipulated the price of cheese in violation of the CEA, thus establishing viable statutory violations. As explained above, however, Appellants do not raise a genuine issue of material fact as to the existence of a conspiracy or intentional price manipulation. Without evidence of either of these fraudulent dealings, "it follows that [Appellants] cannot demonstrate that [Schreiber was] enriched thereby." *Omnicare*, 629 F.3d at 723; *see also Ass'n Ben. Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("When the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable.") (emphasis in original). Therefore, we affirm the district court's grant of summary judgment in favor of Schreiber and against Appellants' unjust enrichment claim.

## D. Discovery

After Schreiber filed its summary judgment motion in December 2013, the parties began requesting depositions from each others' employees. On May 22, 2014, Schreiber moved for a protective order to prevent Appellants from deposing eight Schreiber witnesses. Magistrate Judge Maria Valdez granted Schreiber's motion as to six of the eight witnesses (all but Ron

Dunford and Deborah Van Dyk, two of Schreiber's officers) on June 3, 2014. On June 17, 2014, Appellants filed objections to the Magistrate's order with the district court, which the district court overruled on June 25, 2014. Appellants now challenge the district court's ruling on their objections to Magistrate Judge Valdez's order, as well as the district court's limitation of discovery to "high-level" personnel. We review a district court's limitations on discovery for an abuse of discretion. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006); *see also Matter of Rassi*, 701 F.2d 627, 631 (7th Cir. 1983).

When Schreiber moved for summary judgment, the district court gave Appellants six months to conduct Rule 56(d) discovery before responding to the motion. The district court also limited that discovery to information regarding high-level Schreiber and DFA employees that might corroborate Appellants' allegations that those same employees agreed to coordinate purchases of spot cheese on the CME. During this time, Schreiber accommodated requests for various documents, interrogatories, and document subpoenas. Schreiber also agreed to make available for deposition a 30(b)(6) representative, as well as three then-current and former employees. When Appellants sought to depose eight additional employees, Schreiber moved for a protective order preventing their depositions for Rule 56(d) purposes.

Appellants essentially argue that the scope of discovery as limited by the district court prevents them from uncovering evidence of the conspiracy, but they do so without indicating why the depositions they seek would be likely to yield relevant information. Instead, they merely request leave to cast a wider net with the apparent hope that, with it, they would uncover

direct evidence of conspiracy. In *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869 (7th Cir. 2005), we held that the district court did not abuse its discretion in denying additional discovery where the request was "based on nothing more than mere speculation and would amount to a fishing expedition." *Id.* at 885. We noted that "[t]he only reason to believe that additional, relevant evidence would materialize from deposing the defendants' employees is the [appellants'] apparent hope of finding a proverbial 'smoking gun.'" *Id.*

Here, the district court did not abuse its discretion in affirming Magistrate Judge Valdez's order over Appellants' objections for largely the same reason as in *Davis*. Appellants have not presented any evidence that the six depositions, if permitted, would yield relevant information. Additionally, as the district court explained, the passage of ten years since the date of the alleged conspiracy makes it unlikely that these individuals would have information relevant to establishing a conspiracy. Under these circumstances, it cannot be said that the district court abused its discretion in affirming the Magistrate Judge's order preventing the deposition of six Schreiber employees and limiting discovery to only "high-level" employees.

### E.  Inclusion in the DFA Settlement

Finally, Appellants also challenge Schreiber's inclusion in the court-approved DFA Settlement that Appellants negotiated with all of the defendants named in the initial complaint. Earlier in this litigation, Appellants agreed to permit Schreiber to participate in the DFA Settlement as a condition of receiving approval of their proposed class

settlement. Pursuant to the settlement judgment to which Appellants agreed, Schreiber's inclusion in the settlement class is only entitled to reconsideration by the district court should its entry of summary judgment be reversed. Therefore, Schreiber's inclusion in the DFA Settlement will stand along with the district court's grant of summary judgment.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.